# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY AND BOSTON RETIREMENT SYSTEM, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **C.A. No. 2019-0228-JRS** |
| FACEBOOK, INC., a Delaware Corporation, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  July 30, 2019
Date Decided:  October 29, 2019

Robert J. Kriner, Jr., Esquire, Scott M. Tucker, Esquire, Tiffany J. Cramer, Esquire and Vera G. Belger, Esquire of Chimicles Schwartz Kriner & Donaldson-Smith LLP, Wilmington, Delaware, Attorneys for Plaintiffs Southeastern Pennsylvania Transportation Authority and Boston Retirement System.

David E. Ross, Esquire and R. Garrett Rice, Esquire of Ross Aronstam & Moritz LLP, Wilmington, Delaware, Attorneys for Defendant Facebook, Inc.

**SLIGHTS, Vice Chancellor**

Facebook, Inc. (or the "Company") operates social media platforms used by over 2.2 billion people worldwide. Its business model contemplates that it will derive substantial revenue from selling advertisements. Given the importance of advertising revenue to its success, Facebook monitors and records advertising trends very carefully and reports that data to customers and investors. In 2016, Facebook overestimated the amount of time users spent watching video advertisements on its platforms, leading to negative media reports and lawsuits by some of its advertising customers. Almost two years later, after announcing that it expected its meteoric growth rate to decline, Facebook "suffered the biggest-ever one-day loss in market value for a U.S.-listed company."[1] As Facebook confronted these challenges, its board continued to authorize increases in executive compensation.

Plaintiffs, Southeastern Pennsylvania Transportation Authority ("SEPTA") and Boston Retirement System ("Boston"), are Facebook stockholders. They question Facebook's executive compensation practices and have demanded to inspect Company books and records pursuant to Section 220 of the Delaware General Corporation Law ("Section 220") in aid of four stated purposes.[2] Specifically, they have advised Facebook they require inspection: (1) to determine "how to vote with respect to the 2019 Say On Pay Vote," (2) to determine "whether

---

[1] JX 050 at 1.

[2] 8 *Del. C.* § 220.

1

to pursue contact with Facebook's directors and/or minority stockholders concerning Facebook's decelerating revenue growth and executive compensation determinations," (3) to "investigate possible fiduciary wrongdoing, mismanagement or unjust enrichment by Facebook directors or officers in connection with advertising sales and compensation awards decisions" and (4) to "investigate the independence of the Board of Directors to consider and act on a stockholder demand to initiate claims for fiduciary mismanagement, wrongdoing or unjust enrichment."[3]

In response to Plaintiffs' inspection demands, Facebook produced certain documents pursuant to a confidentiality agreement.[4] Plaintiffs asked for more; Facebook refused on grounds it had already produced enough. Plaintiffs then initiated this summary proceeding under Section 220. In its pretrial brief, Facebook stated it was resisting Plaintiffs' demands on the grounds that Plaintiffs have failed to state a proper purpose for inspection and have demanded books and records that are not necessary and essential to their stated purposes.[5]

By stipulation of the parties, the matter was tried on a paper record.[6] After carefully reviewing the evidence and arguments of counsel, I conclude Plaintiffs

---

[3] Compl. ¶ 1; JX 052; JX 053.

[4] JX 057; JX 058.

[5] Facebook, Inc.'s Pre-Trial Br. (D.I. 22) ("Def.'s Br.") at 15, 29.

[6] Pre-Trial Stipulation and Proposed Order (D.I. 25) ("PTO") ¶ 18.

have failed to demonstrate a proper purpose for inspection. The Facebook board of directors (the "Board") is exculpated from liability for breaches of the duty of care, and there is no evidence of a loyalty breach arising from Facebook's executive compensation practices. Moreover, Facebook has already produced all of the books and records that are "necessary and essential" to fulfill Plaintiffs' stated purposes. Accordingly, I decline to compel Facebook to produce the requested books and records and will enter judgment in its favor.

## I. FACTUAL BACKGROUND

I have drawn the facts from the parties' stipulations of fact, the joint exhibits introduced at trial and from reasonable inferences that flow from that evidence. To the extent objections have been raised with respect to proffered evidence, I have either not considered that evidence or have addressed the objection in the opinion.[7]

---

[7] Much of Plaintiffs' evidence, by necessity, is comprised of publicly available information, including a heavy dose of newspaper and other news media reports. I am mindful that these reports are hearsay. Even so, in a Section 220 proceeding, "[h]earsay statements may be considered, provided they are sufficiently reliable." *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 778 (Del. Ch. 2016). *See also In re Plains All Am. Pipeline, L.P.*, 2017 WL 6066570, at *3–4 (Del. Ch. Aug. 8, 2017) (relying, in part, upon a *Los Angeles Times* article to find that stockholder had stated a credible basis to suspect wrongdoing for purposes of Section 220); *Paul v. China MediaExpress Hldgs., Inc.*, 2012 WL 28818, at *4 (Del. Ch. Jan. 5, 2012) (finding plaintiff stated a credible basis to suspect wrongdoing, in part, based on the plaintiff's identification of "numerous third-party media reports alleging fraudulent conduct by the [company's] officers and directors").

## A. The Parties

Plaintiffs, SEPTA and Boston, are Facebook stockholders that have continuously owned Facebook stock since May 14, 2015 and December 31, 2013, respectively.[8]   Defendant, Facebook, Inc., is a Delaware corporation with its headquarters in Menlo Park, California.[9]

## B. Facebook's Business

Facebook operates social media platforms that connect more than 2.2 billion active users with friends and family through mobile devices, personal computers and other means of data transmission.[10]   Facebook does not charge a user fee for its services but rather generates substantially all of its revenue from selling commercial advertising placements.[11]   To demonstrate value to its advertising customers, Facebook has created metrics to quantify user engagement with advertisements hosted on its platforms.  Advertisers rely on these metrics when determining how many advertisements to place (and pay for) with Facebook during their various business cycles.[12]

---

[8] JX 052 at Ex. A; JX 053 at Ex. A.

[9] PTO ¶ 2.

[10] JX 062 at 5.

[11] *Id.*

[12] JX 008 at 2.

As depicted in the chart below, between 2014 and 2018, Facebook's advertising revenue increased from $11.49 billion to $55.01 billion.[13] By 2018, advertising accounted for more than 98% of Facebook's $55.83 billion in revenue.[14]

| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
|---|---|---|---|---|---|---|
| **Q1** | $2,265 | $3,317 | $5,201 | $7,857 | $11,795 | $14,912 |
| **Q2** | $2,676 | $3,827 | $6,239 | $9,164 | $13,038 | |
| **Q3** | $2,957 | $4,299 | $6,816 | $10,142 | $13,539 | |
| **Q4** | $3,594 | $5,637 | $8,629 | $12,779 | $16,640 | |
| **Annual** | $11,492 (65%) | $17,079 (49%) | $26,885 (57%) | $39,942 (49%) | $55,013 (38%) | |

*Facebook Advertising Revenue (in millions) (and Annual Growth Rate)*

As the numbers show, while Facebook's revenue has continued to increase, the annual advertising *growth rate* has fluctuated and has decreased each year from 2016 to 2018.[15]

## C. Executive Compensation

Plaintiffs seek to investigate whether the Board breached its fiduciary duties by overcompensating executives during a period when Facebook's revenue growth

---

[13] Def.'s Br. at 6–7 (incorporating data from JX 062 at 44, 49; JX 066 at 13).

[14] JX 062 at 44–45 (reflecting that advertising made up $55.013 million out of the $55.838 million total revenue for the fiscal year ending December 31, 2018).

[15] *Id.*

rate was steadily decreasing.[16]  The current Board members are Mark Zuckerberg, Sheryl Sandberg, Peggy Alford, Marc Andreessen, Kenneth Chenault, Susan Desmond-Hellmann, Peter Thiel and Jeffrey Zients.[17]  Two Board committees are relevant here, the Audit and Risk Oversight Committee (the "Audit Committee") and the Compensation and Corporate Governance Committee (the "C&G Committee").[18]  Prior to the 2018 stockholder meeting, Susan Desmond-Hellmann, Reed Hastings and Peter Thiel were members of the C&G Committee.[19]  Reed Hastings's term as a director ended in 2018—leaving only Susan Desmond-Hellmann and Peter Thiel on the C&G Committee (both of whom are independent directors).[20]  Since 2012, the C&G Committee has been advised by Compensia, a leading compensation consulting firm.[21]

---

[16] JX 052; JX 053.  While it initially appeared Plaintiffs were concerned about, and wished to investigate, issues relating directly to the erroneously calculated advertising metrics, Plaintiffs clarified at trial that their inspection demand relates to the "compensation committee's consideration of declining revenue growth in a [more] general sense." Trial Tr. 18.

[17] PTO ¶ 3.

[18] JX 064 at 16.

[19] *Id.*

[20] *Id.* at 17; JX 076; JX 064 at 18 ("Each member of this committee is a non-employee director, as defined pursuant to Rule 16b-3 promulgated under the Exchange Act.").

[21] JX 064 at 20.

6

The following table from Facebook's 2019 Definitive Proxy Statement reflects executive compensation from 2016 to 2018:[22]

**2018 Summary Compensation Table**

The following table presents summary information regarding the total compensation awarded to, earned by, or paid to each of the named executive officers for services rendered to us for the years ended December 31, 2018, 2017, and 2016.

| Name and Principal Position | Fiscal Year | Salary ($)[1] | Bonus ($)[2] | Stock Awards ($) [3] | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Mark Zuckerberg | 2018 | 1 | — | — | 22,554,542[4] | 22,554,543 |
| CEO | 2017 | 1 | — | — | 9,101,965[4] | 9,101,966 |
| | 2016 | 1 | — | — | 6,015,431[4] | 6,015,432 |
| Sheryl K. Sandberg | 2018 | 843,077 | 638,310 | 18,423,523 | 3,823,508[5] | 23,728,418 |
| COO | 2017 | 795,769 | 640,378 | 21,072,431 | 2,687,643[5] | 25,196,221 |
| | 2016 | 738,077 | 1,293,635 | 19,908,426 | 2,609,319[5] | 24,549,457 |
| David M. Wehner | 2018 | 753,846 | 499,494 | 18,423,523 | 9,250 | 19,686,113 |
| CFO | 2017 | 711,539 | 633,317 | 21,072,431 | 9,000 | 22,426,287 |
| | 2016 | 662,692 | 940,421 | 14,931,596 | 9,566 | 16,544,275 |
| Christopher K. Cox[6] | 2018 | 753,846 | 499,494 | 18,423,523 | 9,250 | 19,686,113 |
| Former CPO | 2017 | 711,539 | 567,404 | 21,072,431 | 9,000 | 22,360,374 |
| | 2016 | 658,846 | 933,209 | 14,931,596 | 9,538 | 16,533,189 |
| Mike Schroepfer | 2018 | 753,846 | 570,744 | 18,423,523 | 9,250 | 19,757,363 |
| CTO | 2017 | 711,539 | 633,317 | 21,072,431 | 9,000 | 22,426,287 |
| | 2016 | 658,846 | 859,356 | 14,931,596 | 9,377 | 16,459,175 |

Facebook releases periodic information in SEC filings regarding the factors it considers in awarding executive compensation.[23] According to these disclosures, the C&G Committee bases its compensation determinations on business performance and seeks to motivate executives to focus on company-wide priorities, including revenue growth, by rewarding them for individual results and

---

[22] JX 064 at 33–34.

[23] *Id.* at 21–43.

7

achievements.[24]  Additionally, the C&G Committee uses comparative market data from similarly situated companies to inform compensation levels.[25]

Stockholders are apprised of the C&G Committee's goals and processes because, in compliance with SEC guidance, Facebook conducts a non-binding Say On Pay advisory vote every three years—providing stockholders a chance to vote on proposed executive compensation.[26]  Facebook's 2016 and 2019 Say On Pay proposals were approved.[27]  The next Say On Pay vote is set to occur in 2022.[28]

## D. The Advertising Metric Calculation Errors

On September 22, 2016, the *Wall Street Journal* published an article titled "Facebook Overestimated Key Video Metric for Two Years."[29]  The article highlighted Facebook's own disclosure that the Company had artificially inflated the

---

[24] *Id.* at 26 (outlining the elements of executive compensation as: (1) base salary, (2) performance-based cash incentives and (3) equity-based compensation).

[25] *Id.* at 24–25. Examples of these companies include Alphabet, Amazon, Apple, Microsoft and Netflix, among others. *Id.*

[26] *Id.* at 52.

[27] *Id.* at 29.

[28] *Id.*

[29] JX 008.

metric for the average time users spend watching videos.[30]  Facebook responded to

the article on September 23, 2016, by releasing the following statement:

> [W]e found an error in the way we calculate one of the video metrics on our dashboard—average duration of video viewed.  The metric should have reflected the total time spent watching a video divided by the total number of people who played the video.  But it didn't—it reflected the total time spent watching a video divided by only the number of "views" of a video (that is, when the video was watched for three or more seconds).  And so the miscalculation overstated this metric.[31]

Facebook notified advertising agencies that it "likely overestimated average time

spent watching videos by between 60% and 80%."[32]  While admitting some metrics

were incorrect, Facebook indicated the error did not affect billing and was addressed

and corrected immediately.[33]  This, however, was not Facebook's only metric

calculation error.  Between September 2016 and November 2017, Facebook

disclosed twelve measurement errors that skewed the data Facebook provided to

advertisers.[34]  Generally, the errors had the effect of inflating Facebook's apparent

advertising reach.[35]

---

[30] *Id.*

[31] JX 009.

[32] JX 008.

[33] JX 009.

[34] JX 028.

[35] *Id.* (collecting examples of Facebook metric errors).

On February 10, 2017, Facebook responded to its advertisers' concerns by arranging an audit by the Media Rating Counsel to verify the accuracy of the information it provides to advertisers.[36] Facebook also announced a comprehensive plan to "provide transparency, choice and accountability" to advertising customers.[37] Additionally, Facebook engaged PricewaterhouseCoopers and Deloitte to review the Company's advertising metrics systems.[38] The reports from these firms were promptly presented to the Audit Committee.[39]

Some Facebook advertisers reacted to the metric error issues by either cutting spending on Facebook advertising or filing lawsuits.[40] For instance, on December 23, 2016, a class action suit on behalf of former Facebook advertisers was filed in the United States District Court for the Northern District of California.[41] And, on July 10, 2018, a class of former customers filed an action in Arkansas state

---

[36] JX 023.

[37] *Id.*

[38] JX 029.

[39] JX 003; JX 017; JX 029; JX 032; JX 035.

[40] JX 019; JX 039; JX 041; JX 047; JX 086.

[41] JX 045; JX 046. On October 7, 2019, it was publicly reported that Facebook agreed to a settle this class action for $40 million. *See* Sahil Patel, *Facebook Reaches Proposed Settlement in Video Measurement Lawsuit*, WALL ST. J. (Oct. 7, 2019), https://www.wsj.com/articles/facebook-reaches-proposed-settlement-in-video-measurement-lawsuit-11570482031.

court for improper charges generated by fake clicks in violation of Facebook's terms of service.[42] The *Wall Street Journal* reported advertisers such as Subway and "[o]ne global beverage company" were planning to cut their advertising spending with Facebook "because of concerns about whether [their] ads are being viewed sufficiently."[43] The article also reported Proctor and Gamble "cut more than $200 million in digital ad spending in 2017, including 20% to 50% cuts at 'several big digital players.'"[44] Despite these cuts, Facebook's advertising revenue continued to grow at rates of 49% and 38%, respectively, for fiscal years 2017 and 2018.[45]

**E. The Revenue Growth Rate Decline**

During an investor call on July 25, 2018, Facebook's CFO, David Wehner, announced that "total revenue growth rate decelerated approximately 7 percentage points in Q2 compared to Q1."[46] He predicted "total revenue growth rates will continue to decelerate in the second half of 2018, and we expect our revenue growth rates to decline by high single digit percentages from prior quarters sequentially in

---

[42] JX 047.

[43] JX 041 at 3.

[44] The article does not say that Proctor and Gamble cut spending with Facebook; it only reports that Proctor and Gamble cut advertising spending generally. *Id.*

[45] JX 062 at 44.

[46] JX 049 at 8.

both Q3 and Q4."[47]  Wehner listed several factors contributing to the deceleration, including Facebook's plans to grow certain experiences with lower monetization levels and to provide its users with more choices regarding data privacy.[48] For context, while Facebook's *growth rate* decreased by 7%, its revenue increased by more than $3.9 billion, its advertising revenue grew by 42% and its net income increased more than 31%.[49]

The 2018 growth rate deceleration was not a complete surprise.  Facebook disclosed in a 2012 SEC filing that "revenue growth will inevitably slow as [Facebook] achieve[s] higher market penetrations rates."[50]  Facebook continued to make this disclosure in subsequent SEC filings.[51]  Nevertheless, one day after Wehner's investor call, Facebook "suffered the biggest-ever one day loss in market value for a U.S.-listed company."[52]  Its stock price dropped 19%, erasing approximately $119.1 billion in market value.[53]

---

[47] *Id.*

[48] *Id.*

[49] JX 048; JX 049 at 8.

[50] JX 078 at 18.

[51] JX 079 at 19 (listing as a business risk the expectation that Facebook's growth rates will decline in the future); JX 080 at 19 (same); JX 081 at 15 (same); JX 082 at 14 (same).

[52] JX 050.

[53] *Id.*

## F. Plaintiffs' Books and Records Demands

On August 2 and August 10, 2018, respectively, SEPTA and Boston sent their demands seeking to inspect Facebook's books and records under Section 220 of the DGCL (the "Demands").[54]  As required by statute,[55] both SEPTA and Boston's demands stated purposes for inspection, which were substantively identical.[56]  The Demands claimed the advertising metric errors resulted in class action lawsuits and caused advertisers to reduce spending on Facebook advertisements.[57]  Against this backdrop, the Demands stated a purpose to investigate the amount of executive compensation paid "in the period of distorted ad sales and related revenue,"[58] and conveyed the stockholders' doubt that "the C&G Committee or the Board or any other committee ha[d] considered the data errors . . . in connection with the executive compensation determinations."[59]

On August 31, 2018, Facebook refused Plaintiffs' demands because they failed to state a proper purpose and because the categories for inspection were

---

[54] 8 *Del. C.* § 220.  JX 052; JX 053.

[55] 8 *Del. C.* § 220(b).

[56] JX 052; JX 053.

[57] JX 052 at 4–5 (citing JX 008); JX 053 at 4–5 (same).

[58] JX 052 at 7, 10; JX 053 at 6, 10.

[59] JX 052 at 11; JX 053 at 10.

overbroad.[60]  The parties met and conferred and Facebook thereafter agreed to produce "board level material[s] (i.e., minutes and presentations) [] relevant to 'measurement errors relating to data provided to Facebook advertisers.'"[61] Facebook's production revealed that the Audit Committee had discussed advertising metric errors and had taken measures, including seeking accreditations from the Media Rating Council and engaging Ernst & Young, Deloitte and PricewaterhouseCoopers, to investigate and address the issue.[62]

On January 19, 2019, Facebook advised Plaintiffs its production was complete and reported that it had "searched for potentially responsive minutes and materials originating from the full Board or any Committee thereof, and ha[d] produced all responsive documents generated from those searches."[63]  Facebook confirmed there were no discussions of the advertising metric issues by the C&G Committee.[64] When discussions between the parties broke down, Plaintiffs commenced this action

---

[60] JX 054; JX 055.

[61] Compl. at Ex. 5.  Facebook ultimately produced nine documents pursuant to confidentiality agreements.  *See* JX 057; JX 058; Compl. ¶¶ 40, 43.  Facebook's production included (1) four sets of Audit Committee minutes (from October 25, 2016, December 7, 2016, February 15, 2017 and September 6, 2017 meetings), and (2) five Audit Committee meeting decks (from February 10, 2016, December 7, 2016, May 31, 2017, September 6, 2017, and December 6, 2017 meetings), all of which concern advertising metrics.

[62] *See* JX 013; JX 016; JX 024; JX 031; JX 029; JX 032; JX 035; JX 029 at 7–8.

[63] Compl. ¶ 44.

[64] JX 083.

because they were dissatisfied that Facebook's production did not contain broader "documents relating to the directors' compensation determinations and decisions."[65]

By the time of trial, two categories of documents requested in the Demands remained in dispute:

> 1. [C&G Committee] minutes and materials concerning growth or decline in Facebook advertisers or advertising-based revenue in connection with compensation determinations for any executive or director (which category includes any such minutes or materials concerning any (i) communication involving an NEO [(named executive officer)] concerning any change in revenue growth, and (ii) communications with advertisers concerning return on advertising investment); and
>
> 2. Director independence questionnaires.[66]

With respect to Board materials, Plaintiffs clarified at trial that they are seeking to inspect only Board-level meeting materials from 2016 to present concerning the extent to which the Board (or its committees) considered advertising revenue growth deceleration in its executive compensation decisions.[67]

---

[65] Compl. ¶ 4.

[66] Pls.' Pre-Trial Br. (D.I. 23) ("Pls.' Br.") at 3. I would be remiss if I did not commend counsel for their substantial efforts in narrowing the disputed issues for trial. Those efforts are very much appreciated by the Court.

[67] Trial Tr. 23–27.

## II. ANALYSIS

A stockholder's right to inspect the books and records of companies in which they are invested is broad but not unlimited.[68] When seeking to inspect books and records—"other than [the corporation's] stock ledger or list of stockholders"[69]—a stockholder bears the burden of proving by a preponderance of the evidence that: "(1) such stockholder is a stockholder; (2) such stockholder has complied with [Section 220] respecting the form and manner of making demand for inspection of such documents; and (3) the inspection such stockholder seeks is for a proper purpose."[70]

### A. The Proper Purpose Requirement

A proper purpose is a purpose "reasonably related to [a stockholder's] interest as a stockholder."[71] Plaintiffs' stated purposes for inspection are:

---

[68] *City of Westland Police & Fire Ret. Sys. v. Axceis Tech., Inc.*, 2009 WL 3086537, at *4 (Del. Ch. Sept. 28, 2009), *aff'd*, 1 A.3d 281 (Del. 2010).

[69] 8 *Del. C.* § 220 ("Where the stockholder seeks to inspect the corporation's stock ledger or list of stockholders . . . the burden of proof shall be on the corporation to establish that the inspection such stockholder seeks is for an improper purpose.").

[70] *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 144 (Del. 2012) (citing 8 *Del. C.* § 220(c)). Facebook does not challenge whether Plaintiffs are Facebook stockholders or whether their demands satisfy the form and manner requirements of Section 220. Def.'s Br. at 24.

[71] 8 *Del. C.* § 220(b) ("A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder.").

(1) to aid [Plaintiffs] in determining how to vote with respect to the 2019 Say On Pay Vote, the election of Directors and other matters to be considered at the 2019 Annual Meeting of Shareholders;

(2) to aid [Plaintiffs] in determining whether to pursue contact with Facebook's directors and/or minority stockholders concerning Facebook's decelerating revenue growth and executive compensation determinations, and the performance of Facebook officers, directors and advisors;

(3) to investigate possible fiduciary wrongdoing, mismanagement or unjust enrichment by Facebook directors or officers in connection with advertising sales and compensation awards decisions for Facebook's NEOs, and disclosures regarding Facebook's executive compensation process and determinations to stockholders; [and]

(4) to investigate the independence and ability of the Board of Directors to consider and act on a stockholder demand to initiate claims for fiduciary mismanagement, wrongdoing or unjust enrichment.[72]

When a stockholder seeks to inspect certain documents in furtherance of a particular purpose, the stockholder "must prove by a preponderance of the evidence that [his] primary purpose as to *each category* of the demand is proper."[73] As noted, the two categories of documents subject to dispute at trial were (1) C&G Committee materials regarding advertising revenue in connection with executive compensation determinations and (2) director independence questionnaires.[74] Plaintiffs clarified

---

[72] JX 052 at 12–13; JX 053 at 11–12.

[73] *Beiser v. PMC-Sierra, Inc.*, 2009 WL 483321, at *2 (Del. Ch. Feb. 26, 2009) (emphasis supplied) (citation omitted).

[74] Pls.' Br. at 3.

17

that "[e]ach of the four stated purposes relate[] to the Facebook board's consideration of Facebook's acknowledged internal advertising measurement problems and the trajectory of advertising revenue growth in the executive compensation process."[75]

Based on Plaintiffs' arguments in their briefs and at trial, it is clear the third purpose (i.e., investigating wrongdoing related to executive compensation) is Plaintiffs' primary purpose.[76] I begin the analysis there.

## B. Plaintiffs Failed to Prove a Credible Basis that Mismanagement or Wrongdoing May Have Occurred

Delaware law recognizes "a stockholder's desire to investigate wrongdoing or mismanagement" is a proper purpose.[77] "Such investigations are proper, because where the allegations of mismanagement prove meritorious, investigation furthers the interest of all stockholders and should increase stockholder return."[78] When

---

[75] Trial Tr. 7.

[76] *Id.* ("Each of the four stated purposes relates to the Facebook board's consideration of Facebook's acknowledged internal advertising measurement problems and the trajectory of advertising revenue growth in the executive compensation process"). *See Norfolk Cty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *15–16 (Del. Ch. Feb. 12, 2009), *aff'd*, 977 A.2d 899 (Del. 2009) ("[P]roper purpose has been construed to mean that a shareholder's *primary purpose* must be proper, irrespective of whether any secondary purpose is proper.") (internal quotations omitted).

[77] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006) (internal quotations omitted).

[78] *Id.* at 121.

18

stockholders seek documents to investigate wrongdoing, they must prove "some *credible basis* from which the court can infer that waste or mismanagement may have occurred."[79] A plaintiff meets that standard by introducing "*some evidence* of possible mismanagement as would warrant further investigation of the matter."[80] "[M]ere curiosity or a desire for a fishing expedition will not suffice."[81] The credible basis standard is "the lowest possible burden of proof" in Delaware law, but it is still a burden Plaintiffs must carry.[82] To meet their burden, Plaintiffs were obliged to make "a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[83]

As the Court determines whether Plaintiffs have proven their stated purpose to investigate corporate wrongdoing, the Court must account for Facebook's charter provision that limits director liability "to the fullest extent permitted by law."[84]

---

[79] *Thomas & Betts Corp. v. Leviton Mfg. Co.,* 681 A.2d 1026, 1031 (Del. 1996) (emphasis supplied).

[80] *Sec. First Corp. v. U.S. Die Casting & Dev. Co.,* 687 A.2d 562, 568 (Del. 1997) (original emphasis omitted; emphasis supplied) (quoting *Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.,* 525 A.2d 160, 166 (Del. Ch. 1987)).

[81] *Sec. First*, 687 A.2d at 568.

[82] *Seinfeld*, 909 A.2d at 123.

[83] *Sec. First*, 687 A.2d at 568.

[84] JX 001 at 12.

Because Facebook's charter incorporates Section 102(b)(7) of the DGCL,[85] a purpose aimed at investigating and exposing breaches of the Board's duty of care will not support a demand for inspection.[86] In other words, Plaintiffs' purpose to investigate corporate wrongdoing is only proper to the extent it implicates the Board's duty of loyalty.[87]

The duty of loyalty requires corporate fiduciaries to act in good faith for the benefit of the corporation.[88] To prove a breach of the duty of loyalty, a plaintiff must establish that the fiduciary either consciously disregarded his duties to stockholders or acted in his own interest to the detriment of stockholders.[89] This standard regulates conduct that is "qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)."[90]

---

[85] 8 *Del. C.* § 102(b)(7).

[86] *See Se. Pa. Transp. Auth. v. AbbVie Inc.*, 2015 WL 1753033, at *13 (Del. Ch. Apr. 15, 2015), *aff'd*, 132 A.3d 1 (Del. 2016) ("A stockholder . . . has stated a proper purpose only insofar as the investigation targets non-exculpated corporate wrongdoing.").

[87] *Id.* ("Here, [the presence of the exculpatory provision] means that [the stockholders'] stated purpose to investigate corporate wrongdoing is proper only to investigate whether [the company's] directors breached their fiduciary duty of loyalty.").

[88] *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005).

[89] *Walt Disney Co.*, 907 A.2d at 755.

[90] *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006).

To be sure, Plaintiffs are "not required to prove by a preponderance of the evidence that waste and [mis]management are actually occurring."[91] But they are obliged to present *some evidence* that there are legitimate issues of actionable wrongdoing.[92] This is a tall order given that the focus must be on the duty of loyalty. In this regard, Plaintiffs do not argue the C&G Committee members were conflicted or otherwise not acting independently. Thus, in the absence of a conflict of interest, Plaintiffs must fall back to argue that the "action complained of is otherwise inexplicable, so that bad faith—a motive other than the interest of the Company— *must* be at work."[93]

Plaintiffs attempted to carry their burden to prove a credible basis to investigate Board-level bad faith by arguing "there is a credible basis to infer that the compensation determinations have not duly considered the known internal problems and ramifications to a huge and vital part of the business."[94] Plaintiffs essentially argue the Board's decision to "overcompensate" executives,

---

[91] *Thomas & Betts*, 681 A.2d at 1031.

[92] *Sec. First*, 687 A.2d at 568.

[93] *In re Chelsea Therapeutic Int'l*, 2016 WL 3044721, at *7 (Del. Ch. May 20, 2016). *See also id.* ("to state a bad-faith claim, a plaintiff must show either an extreme set of facts to establish that disinterested directors were intentionally disregarding their duties, or that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.").

[94] Pls.' Br. at 28.

notwithstanding the advertising metric issues and declining revenue growth, can only be explained by bad faith.[95]

Plaintiffs' bad faith theory fails for three separate reasons. First, Plaintiffs failed to present any credible evidence that Facebook overcompensated its executives. Second, Plaintiffs presented no credible evidence to support an inference that Facebook's stock drop was related to the advertising metric errors that were discovered and reported two years earlier. Lastly, even if there was *some evidence* that the metric errors and the stock drop were correlated, there is still no credible evidence that the Board's compensation decisions were motivated by *bad faith.*

## 1. No Credible Basis to Infer Overcompensation

The trial record is devoid of any credible evidence from which the Court could undertake any meaningful analysis of the propriety, or not, of Facebook's executive compensation levels. For example, there is no evidence from which to infer that any individual's salary is inconsistent with Facebook's stated goals of incentivizing revenue growth.[96] Absent some evidentiary basis upon which to question how much Facebook executives are paid, the Court cannot and will not second-guess the

---

[95] *Id.* at 2.

[96] JX 064 at 25 (stating one of Facebook's priorities was "to achieve revenue growth").

C&G Committee's determination of how to best incentivize the Company's officers to generate more revenue.[97]

## 2. No Correlation Between Metric Errors and Stock Price Drop

As for the correlation evidence, Plaintiffs ask the Court to draw an inference that the stock drop resulted from the metric errors because a September 22, 2016, *Wall Street Journal* article indicated that some advertisers decreased their advertising spend after the errors were disclosed.[98]  The metric errors were discovered and publicly addressed by Facebook in September of 2016.[99]  Thereafter, Facebook made no mention of the metric errors in its seven subsequent earnings calls.[100]  Indeed, it was not until after Facebook announced a declining revenue growth rate (attributed to factors other than the advertising metric errors) during an investor call on July 25, 2018, that Facebook's stock price dropped.[101]  Plaintiffs failed to provide any credible evidence these two events, separated by almost two years, are connected.

---

[97] *See In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *13–14 (Del. Ch. Oct. 12, 2011) (declining to second-guess a board's decision to pay employees between 44% and 48% of a company's revenue because that system aligned employees' incentives with the company's goal of generating wealth).

[98] JX 008.

[99] JX 009.

[100] JX 022; JX 026; JX 030; JX 030; JX 034; JX 037; JX 043.

[101] JX 049; JX 050.

### 3. No Credible Basis to Infer Bad Faith

Even if the Plaintiffs were able to show some evidence of a correlation, it is important to remember the stock drop is, at best, tangential to Plaintiffs' theory of wrongdoing. Plaintiffs' theory is *not* that Board-level action (or inaction) caused or could have prevented a corporate trauma. Rather, Plaintiffs' theory is that the Board determined Facebook executive compensation in bad faith.[102] Plaintiffs contend the C&G Committee "had to be aware of the [advertising metric problems]; to at least ask the questions and explore the connection between decelerating growth and the ad measurement problems, while at the same time continuing to award compensation, increased compensation, based on growth in ad revenue."[103]

The fundamental flaw with Plaintiffs' stated purpose is that their theory of wrongdoing strikes directly at the heart of the Board's business judgment.[104] Because the business judgment rule presumes that fiduciaries reasonably informed themselves in making good faith decisions they believe to be in the best interests of the corporation, Plaintiffs must do more than "suggest that there were other metrics

---

[102] Trial Tr. 21 ("[We're not asserting what—it would be a waste claim . . . . Here, it's a loyalty question. That is, the conscious disregard of their known duty to fully inform themselves in the discharge of those specific responsibilities.").

[103] Trial Tr. 22.

[104] *Goldman*, 2011 WL 4826104, at *14 ("The decision as to how much compensation is appropriate to retain and incentivize employees, both individually and in the aggregate, is a core function of a board of directors exercising its business judgment.").

not considered by the [C&G Committee] that might have produced better results."[105] Defendants confirmed (and Plaintiffs accept) that there are no C&G Committee materials discussing the metric errors.[106] The C&G Committee simply did not consider the advertising metric errors in awarding executive compensation.[107] This fact alone, however, is not evidence of corporate wrongdoing—especially when the directors are exculpated from violations of the duty of care. Moreover, the news article Plaintiffs rely on to support their demands indicates the advertising metric errors "didn't affect billing" and reported "no sign of financial damage."[108]

Even if there were a correlation between the metric errors and the growth deceleration, the executive compensation determinations were not "so egregious on [their] face" to imply the C&G Committee acted in bad faith. At the same time Plaintiffs claim the Board acted in bad faith by increasing executive compensation, Facebook's advertising revenue grew by between 38% and 57% annually.[109] And compensation decisions were made only after the C&G Committee considered peer

---

[105] *Id.*, at *16. *See also Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (explaining the business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company") (citations omitted).

[106] Trial Tr. 16–17.

[107] Trial Tr. 29.

[108] JX 041 at 3–4.

[109] Def.'s Br. at 6–7 (incorporating data from JX 062 at 44, 49; JX 066 at 13).

companies' executive compensation and received expert guidance from Compensia.[110]

At trial, Plaintiffs explained they were not making a waste claim, but rather argued that "it's a loyalty question."[111] In the shadow of Facebook's 102(b)(7) exculpatory charter provision, the business judgment deference afforded to independent directors as they make executive compensation decisions and the lack of any credible evidence the Board acted in bad faith, I cannot conclude Plaintiffs carried their burden to present a credible basis to infer actionable wrongdoing.

## C. Plaintiffs Failed to Demonstrate the Records They Seek Are Necessary and Essential to Advance Their Stated Purpose of Investigating Wrongdoing

Even if it were a proper purpose for a stockholder to second-guess an exculpated, non-conflicted board's executive compensation judgment, Plaintiffs already have the information they need to bring whatever claims they may have in a

---

[110] JX 064 at 21–43. *See* 8 *Del. C.* § 141(e) ("A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon . . . such information, opinions, reports or statements presented to the corporation by . . . any [] person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.").

[111] Trial Tr. 21.

complaint.[112]  Facebook has stipulated that it *did not consider* the advertising metrics in setting executive compensation.[113]  To the extent Plaintiffs believe the Board's failure to consider the advertising metric errors in setting executive compensation was a breach of the duty of loyalty, they have the information they need to assert that claim.  Plaintiffs do not need any additional documents to fulfill their stated purpose.

### D. Facilitating Conversations with The Board or Stockholders Is Not a Basis to Compel Additional Inspection

Plaintiffs' second stated purpose for inspection is that they required books and records to determine whether to "pursue contact with Facebook's directors and/or minority stockholders concerning Facebook's decelerating revenue growth and executive compensation determinations, and the performance of Facebook officers, directors and advisors."[114]  But our law is clear that the stated purpose for inspection must be the stockholder's actual purpose, and "[t]his court may consider a plaintiff's actual purpose, and discount any secondary or ulterior purposes."[115]

---

[112] *See Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 118 (Del. 2002) ("The issue is whether the documents are necessary and essential to satisfy the stockholder's proper purpose.").

[113] Trial Tr. 29 ("[T]o the extent we have board and committee documents that discuss metrics, [Plaintiffs] have them.").  JX 083 ("Facebook's [C&G Committee] has not discussed the advertising metric errors that are the subject of Plaintiffs' demand letters.").

[114] Compl. ¶ 1; JX 052 at 12–13; JX 053 at 13–14.

[115] *Norfolk*, 2009 WL 353746, at *11.

At trial, it was clear that the primary purpose for Plaintiffs' inspection demand was to investigate possible fiduciary wrongdoing.[116] As discussed above, Plaintiffs have failed to prove a credible basis to infer the Board acted in bad faith. Even so, "I cannot say at this point . . . [that Plaintiffs'] only purpose is to explore the possibility of a derivative suit."[117] Thus, to the extent I was satisfied Plaintiffs had demonstrated that additional books and records were "necessary and essential" to fulfill their purpose of engaging with the Board or other stockholders, I might well order inspection.[118] But that is not the state of this record. Plaintiffs already have what is "necessary and essential" to satisfy that purpose—they know what Facebook executives were paid; they know the Board did not consider the advertising metric errors when setting that compensation; and they know more generally how the Company has performed during the timeframes at issue. A conclusory statement that Plaintiffs wish to discuss compensation issues with the Board and/or

---

[116] Trial Tr. 7 ("Each of the four stated purposes relates to the Facebook board's consideration of Facebook's acknowledged internal advertising measurement problems and the trajectory of advertising revenue growth in the executive compensation process.").

[117] *Norfolk*, 2009 WL 353746, at *12.

[118] *See Saito*, 806 A.2d at 118 (requiring documents to be "necessary and essential to satisfy the stockholder's proper purpose").

28

stockholders is not a key to unlock more information than the Company has already

provided.[119]

### E. The Say On Pay Vote Does Not Justify Further Inspection

Plaintiffs also maintain they require the demanded documents to aid them in

"determining how to vote with respect to the 2019 Say On Pay vote."[120]  Of course,

the 2019 vote has already happened.  Undeterred, Plaintiffs contend their stated

purpose is still proper because they will need these documents to determine how to

vote on Say On Pay in 2022.[121]  As Facebook persuasively points out, it is impossible

to know now what facts (and what corporate documents) will be relevant to the 2022

vote.[122]  Any production now would be a waste of time and corporate resources.[123]

---

[119] *Beiser*, 2009 WL 483321, at \*3 ("[A] plaintiff must do more than merely 'state, in a conclusory manner, a generally accepted proper purpose.  [A plaintiff] must state a reason for that purpose, *i.e.*, what it will do with the information, or an end to which that investigation may lead.'") (citing *W. Coast Mgmt. & Capital, LLC v. Carrier Access Corp.,* 914 A.2d 636, 646 (Del. Ch. 2006)).

[120] Compl. ¶ 1; JX 052 at 12–13; JX 053 at 13–14.

[121] Trial Tr. 7 ("[W]hile that specific 2019 meeting is moot, there will be continuing say-on-pay proposals, which my client[s] have a legitimate interest in getting this information for purposes of those votes.").

[122] Trial Tr. 54 ("[I]t's true, there is going to be another vote within three years. But . . . what it's going to look like is simply too speculative to be tied to their interests as stockholders now. . . .  I have no information.  Executives could be different in three years. The people who hold the positions, whose pay you're voting on, could be different in three years.").

[123] *Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at \*17 (Del. Ch. Jan. 25, 2019) ("When considering requests for information . . . in Section 220 proceedings, the court should apply its discretion on a case-by-case basis to balance the

Plaintiffs may renew their demand in advance of the 2022 Say On Pay Vote if they have a proper purpose to do so.

## F. Director Questionnaires

A plaintiff's desire to "investigat[e] demand futility is a proper purpose only if the plaintiff has a credible basis to investigate corporate wrongdoing that ultimately could form the basis of a derivative suit."[124] Plaintiffs conceded during oral argument that this purpose will rise or fall with the success of their demand to investigate fiduciary mismanagement.[125] Because there is no credible basis to suspect wrongdoing, Plaintiffs are not entitled to the Board questionnaires to determine whether the Board is independent for purposes of considering a demand to bring claims relating to such wrongdoing.

## III. CONCLUSION

Delaware law requires a stockholder to demonstrate a credible basis to infer wrongdoing to "maintain a proper balance between the rights of stockholders to obtain information based upon credible allegations of corporat[e] mismanagement

---

need for the information sought against the burdens of production and the availability of the information from other sources, as the statute contemplates.") (internal citation and quotation omitted).

[124] *AbbVie Inc.*, 2015 WL 1753033, at *11 n.92.

[125] Trial Tr. 22–23 ("[I]f we don't have a basis to discover documents based on investigation of wrongdoing, then it's probably correct that investigating demand is not— the burden there is not met.").

and the rights of directors to manage the business of the corporation without undue interference from stockholders."[126] While the credible basis burden is low, it is not meaningless. Plaintiffs have fallen short of meeting their burden. Plaintiffs' other stated purposes fail for the reasons outlined above. Accordingly, judgment will be entered for Defendant[127]; each party shall bear its own costs.

---

[126] *Seinfeld*, 909 A.2d at 122–23.

[127] Defendant shall present a form of judgment, on notice to Plaintiffs, within ten (10) days.